ALVIN B. RUBIN, Circuit Judge:
The issue before us is whether substantial evidence supports the NLRB’s conclusion that the employer, Merchants,[1] in violation of §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act, discharged four employees because they signed union authorization cards, and in order to discourage pro-union activity among its employees. The record permits other inferences and contains evidence that would support the conclusion that the employer acted for sound business reasons, but the standard of review to which we are limited requires us to uphold the Board’s decision.
I.
Although the employer challenges only one aspect of the Board’s order, a brief summary of the circumstances that led to the unfair labor practice charges in this case is necessary to illuminate its analysis and our evaluation of it.
In May, 1976, several of Merchants’ employees initiated a campaign to establish a Teamsters local as the employees’ bargaining agent. During May, the employer’s president and vice president were involved in at least two instances of threats and coercive interrogations directed at pro-union employees. In June, the employer promulgated a strict “no-solicitation rule,” and the employer’s secretary-treasurer threatened a pro-union employee with discharge because of his organizing activity. The employer later announced new employee benefits, some unprecedented in the company, and these were found by the Board to have an illegally coercive effect upon the employees. In July, the employer suspended a pro-union driver without justification for three days. In all these respects, the employer does not dispute the existence of substantial evidence to support the Board’s decision that violations of Section 8(a)(1) of the NLRA occurred.
On June 3, 1976, Jimmy Roberson, the employer’s secretary-treasurer, instructed Mark Shuford, the employer’s director of *1013 terminals, to investigate the possibility of truck route changes in connection with the employer’s impending merger with Mississippi Freight Lines, another carrier, whose operations the employer had conducted in part since 1974 under ICC temporary authority. On June 22, in a memo marked “Confidential,” Shuford notified the terminal supervisors, including Alan Patterson at the Louisville, Mississippi terminal, that the route changes would take effect on June 28, two days before the consummation of the merger. Shuford directed the Louisville supervisor “to make the necessary reduction in . work force to offset the reduction in the work load at Louisville.” On June 26, Patterson discharged the five junior employees at Louisville, four of whom were known to him[2] to be union sympathizers, and the fifth of whom was his son. He informed all five that a reduction in work load caused by the merger required their dismissal. Two of the four who had signed union cards inquired again in August regarding the reasons for their discharge and the possibility of rehire; Roberson informed them that they could not have their jobs back or transfer to a different terminal.
On August 11, 1976, Preston Farr, the driver whom the employer had suspended in July without justification, filed an unfair labor charge alleging that Merchants had engaged in anti-union coercive activity. Thereafter, Virgil Rodgers, the senior employee discharged on June 25, filed an unfair labor charge, in connection with the June discharges and the employer’s other allegedly coercive activities. The General Counsel filed a complaint on both charges.
The employer contends, and the Administrative Law Judge found, that the June 25 dismissals were justified to effect operating economies after Merchants adopted route changes that made its freight operation more efficient and enabled Merchants to handle its freight operations with fewer people. As further evidence of good faith, the Administrative Law Judge noted that the selection of discharged employees was based on seniority, and that the discharged employees were given two weeks’ severance pay plus their accrued vacation benefits. The employer further argues that, when an opening for a full-time driver occurred at the Louisville terminal in December, 1976, after the NLRB complaints had been filed, the job was offered to and accepted by Virgil Rodgers, the senior employee discharged and a complainant in this action.
The NLRB reversed the Administrative Law Juoge with respect to the discharges for essentially two reasons. First, according to the Board, he failed “to give proper weight to the timing of the discharges during a [union] campaign already strenuously opposed” by the employer. Merchants Truck Line, Inc., 1977, 232 NLRB No. 107. Second, the Board found probative the employer’s unwillingness to help the discharged employees to find work at other Merchants terminals. The evidence of work availability and the employer’s repeated denials to the employees that transfers were possible were substantial evidence, in the Board’s view, of the employer’s unlawful motive in discharging the employees.
To counter the employer’s argument of economic justification, the Board urges that the timing of Merchants’ route changes is suspicious, and that the route changes did not sufficiently reduce Merchants’ workload to justify the layoffs. The Board argues that the merger was no more or less certain, and the route changes no more or less risky, in June, 1976 than at any other time after Merchants first took over Mississippi Freight Lines’ operating authority in 1974. Although it acknowledges that the route changes afforded some benefits to the company, the Board insists that economic necessity did not compel the changes when effected, and that the timing is suspect under the circumstances of the company’s anti-union campaign. The Board finally points to what it considers evidence of excessive overtime after June 25 at the Louisville terminal to demonstrate that the route *1014 changes did not eliminate the need for the employees that Merchants discharged.
II.
Our role in reviewing decisions of the National Labor Relations Board is limited: an NLRB decision must be sustained if supported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; NLRB v. Red Top Cab & Baggage Co., 5 Cir. 1967, 383 F.2d 547, 553. Substantial evidence is not mere suspicion, but “such [relevant] evidence as a reasonable mind might accept as adequate to support” the Board’s conclusion. NLRB v. Federal Pacific Electric Co., 5 Cir. 1971, 441 F.2d 765, 770, quoting Consolidated Edison Co. of N. Y. v. NLRB, 1938, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126. The task before us in no way changes because the Board’s judgment differs from that of the Administrative Law Judge in this case; the judge’s contrary finding is part of the record and must be considered, but our province, having done so, is only to determine whether the record as a whole offers substantial evidence to support the Board’s view. Nix v. NLRB, 5 Cir. 1969, 418 F.2d 1001, 1008; Halliburton Co. v. NLRB, 5 Cir. 1969, 409 F.2d 496, 497.
In determining whether the Board’s conclusion that violations of 8(a)(3) occurred is supportable, it is of course crucial to bear in mind the nature of that conclusion. Evidence of an 8(a)(3) violation must be probative of discrimination, not merely of the employer’s hostility towards unionism. Discharge is a traditional management prerogative; lack of justification is not to be lightly inferred:
Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a)(3) forbids.
NLRB v. McGahey, 5 Cir. 1956, 233 F.2d 406, 413; NLRB v. Buddy Schoellkopf Products, Inc., 5 Cir. 1969, 410 F.2d 82.
The General Counsel has the burden of showing that, but for the employer’s intention to discriminate against pro-union employees and thus to discourage union membership, these discharges would not have taken place. In this context, an employer’s general anti-union hostility, and its pattern of anti-union activity, may be significant, when the employer's motives are ambiguous, but, without more, they do not supply the element of unlawful motive. NLRB v. Bogart Sportswear Mfg. Co., Inc., 5 Cir. 1973, 485 F.2d 1203; NLRB v. Materials Transportation Co., 5 Cir. 1969, 412 F.2d 1074; NLRB v. O. A. Fuller Super Markets, Inc., 5 Cir. 1967, 374 F.2d 197; NLRB v. Atlanta Coca-Cola Bottling Co., 5 Cir. 1961, 293 F.2d 300.
With these principles in mind, we turn to the record. As in many cases, some evidence exists of two motives, one lawful, one unlawful. NLRB v. Neuhoff Bros. Packers, Inc., 5 Cir. 1968, 398 F.2d 640. Because direct proof of motive is rarely possible, the General Counsel has been forced to rely on circumstantial evidence, which may be sufficient to carry his burden. NLRB v. La-ney & Duke Storage Warehouse Co., 5 Cir. 1966, 369 F.2d 859. As we have noted, the Board and the Administrative Law Judge have disagreed as to the motives behind the discharges. The Board’s disagreement does not rest on a rejection of testimonial evidence that the Administrative Law Judge found compelling, but rather on different inferences from evidence on the record that both the Administrative Law Judge and the Board have accepted.[3] Such disagreement *1015 by itself is no ground for denying enforcement to the Board’s order. Goodyear Tire & Rubber Co. v. NLRB, 5 Cir. 1972, 456 F.2d 465; Halliburton Co. v. NLRB, supra ; Russell-Newman Mfg. Co. v. NLRB, 5 Cir. 1969, 407 F.2d 247.
In order to demonstrate discrimination on the facts of this case, the General Counsel must carry his burden of proving that at least one of the following factors was not justified by the employer’s economic circumstances: the changes in truck routes; the timing of those changes; the layoff of any workers; or the layoff of these workers in particular.
As to three of these four elements, the General Counsel has not shown lack of justification: the route changes themselves are adequately justified by the savings and greater efficiency realized by Merchants in the hauling of freight between Memphis, Tennessee and Houston, Mississippi, and to and from Carthage, Mississippi. The Board points to costs that Merchants incurred in making the changes that may have made them a mixed blessing. A mixed blessing, however, is a blessing nonetheless. “Management decisions are not subject to the second-guessing of the Board or the Courts unless it is shown by substantial evidence in the record as a whole that the decisions violate the Act.” NLRB v. Materials Transportation Co., supra, 412 F.2d at 1078. No such evidence appears here.
We also find no substantial evidence that, once having made the route changes, management was unjustified in laying off workers at the Louisville terminal. Although the average weekly overtime went up for the workers remaining at Louisville, the increased overtime costs per week were well under the wages that would have been required to retain one additional employee. The evidence that the work at Louisville was being done with unsatisfactory delay is vague, at best.
Finally, having made a decision to discharge employees, the employer would have been justified in discharging five workers according to seniority. Merchants’ “Manual for Personnel” indicates that company policy is to lay off, when necessary, by seniority within the relevant skill field. The discharge of five junior pick-up and'delivery drivers would accord with this policy if not discriminatorily motivated in any other respect. The Board has not shown any inconsistency between Merchants’ selection of the five drivers discharged and its rational, facially neutral policy of discharge according to seniority. NLRB v. Georgia Rug Mill, 5 Cir. 1962, 308 F.2d 89; NLRB v. Redwing Carriers, Inc., 5 Cir. 1960, 284 F.2d 397.
However, we do find substantial evidence on the record as a whole that the timing of the route changes was as likely a result of the employer’s anti-union campaign as it was reflective of the timing of Merchants’ merger with Mississippi Freight. The employer offered nothing but conclusory evidence that the route changes could not have been effectuated at any other time after 1974 with equal advantage. The employer’s Secretary-Treasurer testified that the route changes could have been made under the temporary ICC authority; grants of authority to Merchants that appear in the record bear this out. Although some inconven *1016 ience would have resulted had the route changes been instituted and the merger fallen through, none appears of any consequence. The route changes themselves involved no additional capital investment.
Nor does it appear that the merger itself was any more or less certain in June, 1976 than it had been substantially earlier. In December, 1974, Merchants received an indefinite extension of its temporary authority in order to complete the financial transactions necessary to consummate the merger. Additional extensions were granted in March and April, 1976. Conversely, although the necessary financial transactions were completed at about the time of the discharges, this did not automatically assure ICC approval of the route changes on a permanent basis. A new Certificate of Public Convenience and Necessity covering Mississippi Freight Line’s old authority was not issued until September 17, 1976.
Given two competing inferences of equal plausibility, the Board is permitted to attach special significance to the timing and circumstances of the employer’s anti-union campaign in choosing one. Sweeney & Co. v. NLRB, 5 Cir. 1971, 437 F.2d 1127; Oil City Brass Works v. NLRB, 5 Cir. 1966, 357 F.2d 466; NLRB v. Longhorn Transfer Service, Inc., 5 Cir. 1965, 346 F.2d 1003; NLRB v. Coats & Clark, Inc., 5 Cir. 1956, 231 F.2d 567. We have before permitted the Board to attach special weight to timing where the circumstances surrounding a discharge would otherwise appear innocent. Southern Tours, Inc. v. NLRB, 5 Cir. 1968, 401 F.2d 629.
There is additional evidence that supports the Board’s inference of anti-union motivation. None of the pro-union employees were permitted' transfer to other jobs within the company nor was any assisted in finding work elsewhere. There is some evidence that the failure to transfer laid-off employees was inconsistent with past practice. More important, the record shows that one full-time pick-up and delivery driver was hired in September for the Tupelo, Mississippi terminal, only 80 miles from Louisville. This position was not offered to any discharged employee, although two employees inquired about the possibility of reinstatement in August. In fact, no discharged employee was reinstated until the senior employee discharged in June was reinstated in Louisville after the union lost its representation election and after the General Counsel had filed the complaints.
The substantiality of the evidence is not greatly mitigated by the layoff of one employee who had not supported the union, namely, the terminal manager’s son. Where the central aim of a mass lay-off is to discourage union activity, the discharge is unlawful, even though neutral or anti-union employees suffer in the process. NLRB v. Tesoro Petroleum Corp., 9 Cir. 1970, 431 F.2d 95; Majestic Molded Products, Inc. v. NLRB, 2 Cir. 1964, 330 F.2d 603. In this case, the neutral employee suffered but little; his father helped him to secure full-time employment within a short time of the discharge. The helping hand was not extended to those who favored the union.
Because substantial evidence on the record as a whole supports the Board’s decision, we direct that its order in all respects be ENFORCED.

. Merchants Truck Line, Inc.

. It appears from the record that Patterson’s knowledge of the four drivers’ pro-union sympathies antedated Roberson’s June 3 letter to Shuford.

. We have previously said, "Only in the most rare and unusual cases will an appellate court conclude that a finding of fact made by the National Labor Relations Board is not supported by substantial evidence,” Ward v. NLRB, 5 Cir. 1972, 462 F.2d 8, 9. A review of our decisions suggests two sets of circumstances in which those “rare and unusual cases” occur. One involves the discharge of employees for asserted cause, where despite the existence of anti-union animus on an employer’s part, an employee’s conduct belies any contention that he would not have been fired but for the employer’s hostility to the union, e. g., *1015 NLRB v. Great Dane Trailers, Inc., 5 Cir. 1968, 396 F.2d 769; Frosty Morn Meats, Inc. v. NLRB, 5 Cir. 1961, 296 F.2d 617; NLRB v. Birmingham Publishing Co., 5 Cir. 1958, 262 F.2d 2. Such cases, unlike this one, provide direct evidence of justification for the discharge of particular employees. The second typical case involves solely issues of credibility, where the NLRB rejects an Administrative Law Judge’s credibility findings without justification, e. g., NLRB v. Georgia Rug Mill, 5 Cir. 1962, 308 F.2d 89. Although, as we have said, a disagreement between the Board and its examiner does not change the standard of review, the Administrative Law Judge is in generally the better position to assess credibility, a fact that we may consider in interpreting the record. The Board’s decision in this case necessarily rejects the credibility of conclusory statements by the employer’s witnesses that anti-union hostility played no role in the June 25 discharges. However, this rejection results not from mere suspicion leading to an out-of-hand rejection of pro-employer testimony; the Board has instead been persuaded by other facts on the record, which, if believed, inevitably belie the employer’s witnesses’ testimony.