## In re CORRUGATED CONTAINER ANTITRUST LITIGATION—John W. Culy, Appellant.

### No. 81–1443.

United States Court of Appeals, District of Columbia Circuit.

Argued June 24, 1981.

Decided Aug. 28, 1981.

Steven P. Handler, Chicago, Ill., with whom George Vernon and Richard A. Sloan, Chicago, Ill., were on the brief, for appellant.

Jerrold E. Salzman, Chicago, Ill., for appellees.

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

Before: WALD and MIKVA, Circuit Judges and MARKEY *, Chief Judge, United States Court of Customs and Patent Appeals.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This case is an appeal from an order of civil contempt entered against John W. Culy (appellant), a non-party witness, as a result of his invocation of the fifth amendment privilege against self-incrimination and his refusal to answer certain questions at a deposition taken in Washington, D.C. in connection with multidistrict civil litigation concerning alleged price-fixing in the corrugated paper industry. The contempt order was issued over the telephone from the United States District Court for the Southern District of Texas by the presiding judge in *In Re Corrugated Container Antitrust Litigation*, M.D.L. No. 310, exercising the powers of the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1407(b). For the reasons stated below we hold that jurisdiction over the appeal properly lies in the District of Columbia Circuit but we vacate the order of civil contempt.

## I. BACKGROUND

During his career, appellant has worked for several different companies in the corrugated container industry. Before 1976—the critical period in the controversy—he was employed by the Weyerhaeuser Company (Weyerhaeuser) and the Corrugated Container Company (CORCO), two of the defendants in pending civil antitrust suits. From 1968 to mid-1970 appellant was sales representative and later sales manager of Weyerhaeuser's sales office in Indianapolis, Indiana. From mid-1970 through early 1972 he was assistant sales manager of the Weyerhaeuser plant in Columbus, Indiana. From early 1972 through February 1976 he

was sales manager and later general manager of CORCO's plant in Muncie, Indiana. Appellant left CORCO in 1976 to become general sales manager of the Indiana Box Corporation (Indiana Box). He is currently the regional sales manager of the Anderson Box Company (Anderson Box) in Staunton, Virginia. Anderson Box is a subsidiary of Inland Container which is also a defendant in the civil antitrust cases.

In October 1977 appellant voluntarily submitted to an interview in Dallas, Texas by an FBI agent and his associate (a law student) in connection with a federal criminal investigation of antitrust violations in the corrugated container industry. Appellant was informed that the interviewers were empowered to act as agents of a grand jury, which had instructed them to conduct appellant's interview. During the interview appellant was orally advised that he would not be prosecuted for any of the statements or testimony that he gave.[1] Appellant was not placed under oath. A transcript was later prepared from a tape recording of the interview. Appellant was not subpoenaed to appear and he did not testify before the grand jury. Instead, the interview transcript was given to the grand jury.

In January 1978 a federal grand jury in Houston, Texas indicted fourteen companies and twenty-six individuals for an alleged nationwide conspiracy to fix prices in the corrugated container industry. These consolidated cases were assigned to Chief Judge John V. Singleton of the United States District Court for the Southern District of Texas. Appellant was not indicted at that time and he has not subsequently been prosecuted for any offense. In the ensuing criminal trial, a jury acquitted of all charges each defendant who stood trial. Appellant did not testify at the trial.

While the grand jury investigation and the subsequent criminal trial were in progress, purchasers of corrugated products filed numerous class and non-class actions in various United States District Courts throughout the country. These actions alleged the same type of nationwide price-fixing conspiracy as alleged in the criminal cases. The defendants in the civil actions included the companies named in the criminal indictments as well as a number of companies that were not indicted. Pursuant to 28 U.S.C. § 1407, the Judicial Panel for Multidistrict Litigation consolidated these civil actions in the Southern District of Texas as *In Re Corrugated Container Antitrust Litigation*, M.D.L. 310, and assigned this litigation to Judge Singleton for pretrial proceedings.

The class action civil cases now have been either tried or settled.[2] However, a number of opt-out cases remain pending before Judge Singleton. In the course of discovery, opt-out plaintiffs (appellees) noticed the deposition of appellant for April 3, 1981 in Washington, D.C. Appellant was not subpoenaed but appeared voluntarily in response to the notice of deposition.

At his deposition appellant, upon the advice of counsel, asserted his fifth amendment privilege with respect to pricing and price communications occurring prior to 1975, while he was employed by Weyerhaeuser and CORCO, on the grounds that the answers to appellees' questions would tend to incriminate him. The questions appellant refused to answer were either taken verbatim from, or closely tracked, the transcript of the 1977 FBI interview submitted to the grand jury, portions of which had been previously released to appellees.[3]

---

1. The record in this case, so far as we can ascertain it, contains no details of this no-prosecution agreement. *See* note 29 *infra*.

2. The settlements have been remanded by the Fifth Circuit to the district court for further findings regarding their fairness to the class. *In re Corrugated Container Antitrust Litigation,*

643 F.2d 195 (5th Cir. 1981), Joint Appendix ("J.A.") 64–118.

3. The propriety of disclosing the grand jury testimony is currently being litigated in the Fifth Circuit. *See In re Corrugated Container Antitrust Litigation*, 620 F.2d 1086, 1089 n.2 (5th Cir. 1980) (Consolidated Appeals of Franey, Fleischacker and Hopkins) (hereinafter *Franey*).

Upon appellant's refusal to answer the questions in dispute, appellees' counsel telephoned Judge Singleton on-the-spot and moved to compel appellant to answer. After hearing argument from both sides and questioning appellant over the phone the judge expressly invoked his authority to exercise the powers of the District Court for the District of Columbia pursuant to 28 U.S.C. § 1407(b) and ordered appellant to answer six specific questions. However, appellant persisted in his assertion of the fifth amendment privilege. Judge Singleton then held appellant in civil contempt, sentenced him to six months in jail and fined him $5,000.[4] Judge Singleton suspended imposition of sentence pending appeal and ruled that appellant would have a chance to purge himself of contempt if the court of appeals affirmed the contempt order.[5] This appeal followed.

## II. JURISDICTION

The initial question concerns which circuit court has jurisdiction over this appeal. The general appellate jurisdiction statute, 28 U.S.C. § 1294, states that:

Appeals from reviewable decisions of the district and territorial courts shall be taken as follows:

(1) From a district court of the United States to the court of appeals for the circuit embracing the district. . . .

The multidistrict litigation statute provides in relevant part:

The judge or judges to whom such [multidistrict] actions are assigned, . . . may exercise the powers of a district judge in

any district for the purpose of conducting pretrial depositions in such coordinated or consolidated pretrial proceedings.

28 U.S.C. § 1407(b). Thus, the precise issue before us is whether an appeal from a multidistrict litigation transferee judge's order of contempt issued over the telephone from the transferee judge's home district in Texas to a non-party witness being deposed in Washington, D.C. should be taken in the Fifth Circuit which embraces the transferee district or in the District of Columbia Circuit which embraces the deposition district. It is clear to us that the District of Columbia Circuit has jurisdiction because the contempt order was issued pursuant to the exercise by Judge Singleton of the powers of a district judge in the District of Columbia rather than in his capacity as a sitting judge in the Southern District of Texas where the multidistrict litigation is now based. Our conclusion as to the appropriate appellate forum is in accord with the Fifth Circuit's earlier ruling that it lacked jurisdiction over this appellant,[6] as well as the prior jurisdictional rulings by the Second, Fifth, and Seventh Circuits with respect to similar appeals by other non-party deponents in this same multidistrict litigation.[7]

### A. *Section 1407's Limited Grant of Power*

In our federal judicial system, judges of a particular district court may exercise their authority only within that district except under specific limited designations permitted by statute. *See, e. g.,* 28 U.S.C. §§ 292, 295, 296.[8] When so designated, the judge

---

**4.** This ruling rendered April 3, 1981 was embodied in a written order dated April 7, 1981. J.A. 1–3.

**5.** The district court treated appellees' motion to compel testimony as an oral application pursuant to the recalcitrant witness statute, 28 U.S.C. § 1826, J.A. 1. Upon appellant's motion, argument was heard on an expedited basis.

**6.** The Fifth Circuit dismissed this appeal for lack of jurisdiction on the basis of its decision in *Franey. In re Corrugated Container Antitrust Litigation,* 647 F.2d 460 (5th Cir. 1981).

**7.** *In re Corrugated Container Antitrust Litigation,* 644 F.2d 70, 73–74 n.6 (2d Cir. 1981)

(Appeal of *Fleischacker*) (hereinafter *Fleischacker*); *Franey,* 620 F.2d 1086, 1090–91; *In re Corrugated Antitrust Litigation,* 655 F.2d 748 at 750 n.2 (7th Cir. 1981) (*Appeal of Conboy*) (hereinafter *Conboy*).

**8.** *See also* 28 U.S.C. § 132:

(a) There shall be in each judicial district a district court . . .
(b) Each district court shall consist of the district judge or judges for the district in regular active service. Justices or judges designated or assigned shall be competent to sit as judges of the court.

And in Ch. 13 of Title 28, Assignment of Judges To Other Courts:

sits as a judge of the court to which he is assigned, but he does not exercise extraterritorial jurisdiction in his capacity as a judge of his home court to which he is permanently assigned.

■ Section 1407, which established special procedures allowing the transfer of pretrial proceedings in multidistrict litigation, contains two kinds of authority. One is for the transfer of pending causes of action from one district to another district for pretrial purposes only. 28 U.S.C. § 1407(a).[9] The judge who is assigned to preside over the transferred action exercises his authority as a member of the district court to which the action has been transferred. Congress believed

> that the possibility for conflict and duplication in discovery and other pretrial procedures in related cases [could] be avoided or minimized by ... centralized management. To accomplish this objective the [statute] provides for the transfer of venue of an action for the limited purpose of conducting coordinated pretrial proceedings.

H.R. Rep. No. 1130, 90th Cong., 2d Sess. 2 (1968) U.S. Code Cong. & Admin.News 1968, pp. 1898, 1899. *See generally In re: Multi-*

*Piece Rim Products Liability Litigation (Appeal of Firestone Tire & Rubber Co.)*, 653 F.2d 671 at 677 (D.C. Cir., 1981) (hereinafter *Multi-Piece Rim*) (authorities cited). Ordinarily, as appellant points out, appeals from the orders of the judge appointed to preside over the transferred case go to the appellate court which normally rules over the transferee district court rather than the appellate court embracing the transferor district. *Utah v. American Pipe & Construction Co.*, 316 F.Supp. 837 (C.D. Cal. 1970). *See In re Plumbing Fixture Cases*, 298 F.Supp. 484 (Jud.Pan.Mult.Lit. 1968).

■ The second grant of authority in section 1407 is of a different sort. It grants to the *judges* who have been assigned multidistrict litigation the powers of a district judge in other districts in order to supervise depositions being conducted in those other districts.[10] 28 U.S.C. § 1407(b) (*see* text *supra*). The deposition proceedings remain anchored in the courts of the districts where they are being conducted, but because of the obvious policy reasons for allowing a single judge to preside over the disparate activity in a multidistrict case, *see In re IBM Peripheral EDP Devices Antitrust Litigation*, 411 F.Supp. 791 (Jud.Pan.Mult.Lit. 1976), the multidistrict judge is granted the

---

Section 292 (Designation of district judges to districts in other circuits as business or necessity requires)
Section 295 (No designation and assignment shall be made without consent of the chief judge or judicial council of the circuit from which the judge is to be designated; all designations and assignments shall be filed with the Clerks of the Courts from and to which made)
Section 296 (Designated judge may be required to perform any duty which might be required of a judge of the court to which he is designated).

**9.** 28 U.S.C. § 1407(a) provides:
(a) When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will pro-

mote the just and efficient conduct of such actions. Each action so transferred shall be remanded by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated: *Provided, however,* That the panel may separate any claim, cross-claim, counter-claim, or third-party claim and remand any of such claims before the remainder of the action is remanded.
(Emphasis in original.)

**10.** Section 1407(b) not only gives the transferee judge the power to conduct depositions in foreign jurisdictions, but also "the members of the judicial panel on multidistrict litigation, and other circuit and district judges designated when needed by the panel...." *See* H.R. Rep. No. 1130, *supra* at 3, U.S.Code Cong. & Admin. News 1968, pp. 1898, 1900 ("Judicial Panel on Multidistrict Litigation ... is empowered to ... designate ... judges as deposition judges in any district....").

same powers as a judge of those courts where the depositions are being taken.[11]

Appellant does not dispute that Judge Singleton here adjudged him in contempt while acting as a judge of the District Court for the District of Columbia. Acting as such, Judge Singleton was bound by the rules and procedures of the District of Columbia District Court and although as a temporary judge thereof he had the power to adjudge the deponent in contempt and set a penalty, any execution of that penalty would have to be in accord with the rules and procedures of the District Court for the District of Columbia. It follows that any appeal from his exercise of the powers of a district judge of the District Court for the District of Columbia must be heard by the Court of Appeals for the District of Columbia.

B. *The Requirements of the Federal Rules of Civil Procedure*

The legislative history of section 1407 shows that Congress envisioned that "pretrial proceedings" in multidistrict litigation, defined to include "deposition and discovery" were to be governed by the Federal Rules of Civil Procedure. H.R. Rep. No. 1130, *supra* at 3. Our resolution of the jurisdictional question is consistent with that Congressional intent because there is no question that jurisdiction would lie in this circuit if this appeal were not part of a section 1407 multidistrict litigation.

▮ Fed.R.Civ.P. 37, which governs the imposition of sanctions against persons unjustifiably resisting discovery, says that a motion to compel the testimony of a non-party deponent must be made to the court in the district where the deposition is being held.[12] The reason for this, of course, is to spare the non-party witness the inconvenience and hardship of traveling to a distant forum in order to defend himself. Only a judge of the court in the deposition district can adjudge the recalcitrant witness in contempt. *See Multi-Piece Rim, supra,* 653 F.2d at 675–676 & n.1; 4A Moore's Federal Practice ¶¶ 37.02 & 37.03 (1980–81 Supp.); Wright & Miller, *Federal Practice and Procedure,* Civil § 2287.[13]

11. The transferee judge, of course, remains a judge of his home district. When presiding over a foreign deposition he may be "exercising the powers of" the foreign deposition district court, but that does not transform the transferee judge into a new member of the deposition court. *See* 28 U.S.C. § 132(b).

The legislative history is sparse on the interpretive question we face. We have found one snippet of relevant legislative history and it supports our finding of jurisdiction over this appeal. *See* [Judicial Conference] Report of the Co-ordinating Committee on Multiple Litigation Recommending New Section 1407, Title 28 (1965), reprinted in appendix to *In re Plumbing Fixture Cases,* 298 F.Supp. 484 (Jud.Pan. Mult.Lit.) (1968) ("The deposition judges would have powers over the deponents and the actions *as* judges of the districts in which the depositions are taken"). 298 F.Supp. at 499.

The Second Circuit accurately identified the policy trade-offs raised by the present jurisdictional issue. *Fleischacker,* 644 F.2d at 73–74 n.6. Any potential lack of uniformity engendered by appellate review by different circuit courts of depositions presided over by a single transferee judge in different districts is balanced against the need for uniformity in decisions on depositions within each of those circuits. It seems eminently reasonable that the rules governing deposed non-party witnesses should be determined by the jurisdiction in which they may be deposed rather than by a distant place in which the multidistrict litigation is pending.

12. Fed.R.Civ.P. 37(a)(1) provides: "An application for an order to a deponent who is not a party shall be made to the district where the deposition is being taken." Fed.R.Civ.P. 37(b)(1) authorizes sanctions by the court in the district where the deposition is taken for failure to comply with the order.

13. Were appellant a party, or "an officer, director, or managing agent of a party," an argument might be made that the transferee court where the action is pending had jurisdiction to adjudge him in contempt. *See* Fed.R.Civ.P. 37(b)(2) and discussion in 4A Moore's Federal Practice ¶¶ 37.02 & 37.03 (1980–81 Supp.). The appellant here makes a half-hearted attempt to bring himself within that rule by noting that the deposition was taken pursuant to a notice, not a subpoena, identifying appellant as an employee of one of the subsidiaries of a party corporation. The short answer, however, is that the judge specifically referred to appellant as a nonparty witness, so that he was obviously not acting pursuant to his powers as a judge of the transferee forum. And it is not entirely clear that sanctions may be imposed

Fed.R.Civ.P. 45 demonstrates that if appellant had not voluntarily responded to the notice of his deposition he could not have been required to travel to the Southern District of Texas for a deposition by a subpoena issued from that district.[14] As a nonparty witness, he was not subject to the jurisdiction of the District Court for the Southern District of Texas. *Multi-Piece Rim, supra; Franey*, 620 F.2d at 1090 & n.3, citing *Lincoln Laboratories, Inc. v. Savage Laboratories, Inc.*, 27 F.R.D. 476, 477, 478–79 (D. Del. 1961). Since appellant lives and works in the vicinity of the District of Columbia, a subpoena could only have issued in or near the District of Columbia and only a judge in the district where the deposition is taken, not where the litigation is pending, could hold appellant in contempt. *Id.*

Therefore, with regard to the procedures governing the depositions of non-party witnesses, section 1407 and the Federal Rules of Civil Procedure are not conflicting but complementary and nothing in either persuades us that this appeal should be heard in any other circuit.

### III. THE GROUNDS FOR THE CONTEMPT ORDER

 "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S.Const. Amend. V. The privilege against compulsory self-incrimination "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigative or adjudicatory. . . ." *Kastigar v. United States*, 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). A witness may properly invoke the privilege when he reasonably apprehends a risk of self-incrimination though no criminal charges are pending against him. *Marchetti v. United States*, 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968); *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951); *Franey*, 620 F.2d at 1091; *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084, 1087 n.5 (5th Cir. 1979). However, if the answers which a witness might give to the questions asked could not be incriminating within the meaning of the fifth amendment, the witness must answer. *Zicarelli v. New Jersey State Commission of Investigation*, 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972). The witness is not exonerated merely because he declares that he would incriminate himself, "[i]t is for the court to say whether his silence is justified" and to require him to answer if "it clearly appears to the court that he is mistaken." *Hoffman, supra*, 341 U.S. at 486, 71 S.Ct. at 818.

> To sustain the privilege, it need only be evident from the implications of the question, and the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.

*Id.* at 486–87, 71 S.Ct. at 818. "Injurious disclosure" is not confined to answers that would support a conviction. It includes any statements "which would furnish a link in the chain of evidence needed to prosecute." *Id.* at 486, 71 S.Ct. at 818. Moreover, the witness is not required to prove that "injurious disclosure" would occur:

> [I]f the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually

on the individual employee as well as against the corporate party by a judge of the transferee district when the employee fails to appear or answer questions. *See* 4A Moore's Federal Practice, ¶¶ 37.02[1], nn.4–5, 37.03[2] (and cases cited therein).

In any event at most appellant can only be considered a managing agent of Inland Container and he has not refused to answer questions covering the period of his employ with Inland Container.

**14.** Fed.R.Civ.P. 45(d)(2) provides:

A resident of the district in which the deposition is to be taken may be required to attend an examination only in the county wherein he resides or is employed or transacts his business in person, or at such other convenient place as is fixed by an order of court. A nonresident of the district may be required to attend only in the county wherein he is served with a subpoena, or within 40 miles from the place of service, or at such other convenient place as is fixed by an order of court.

required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee.

*Id.*

 If testimony is incriminatory, *i. e.,* tending to show that the witness has engaged in criminal activities, then the propriety of invoking the fifth amendment privilege depends on whether the risk of prosecution is substantial and real and not merely fanciful. *Zicarelli v. New Jersey State Commission of Investigation,* 406 U.S. 472, 478, 92 S.Ct. 1670, 1675, 32 L.Ed.2d 234 (1972); *Marchetti v. United States,* 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed.2d 889 (1968); *Hoffman, supra; Franey,* 620 F.2d at 1091–92; *In re Folding Carton Antitrust Litigation,* 609 F.2d 867, 871 (7th Cir. 1979). When a witness can demonstrate a fear of prosecution, which is more than fanciful or merely speculative, he has a claim of privilege that meets constitutional muster. *Id.*

The district court here refused to accept appellant's invocation of the fifth amendment privilege. During the contempt hearing the judge stated:

> that the answers would not lead to possible prosecution under the Fifth Amendment or to any prosecution, [prosecution] is either fanciful or has been barred by the Statute of Limitations, it's fanciful at most.

Tr. 125.[15] The subsequent written order embodying this ruling contained two grounds for holding appellant in contempt: (1) that the questions asked were derived from immunized testimony and therefore appellant's answers could not be used against him, and (2) appellant's fear of prosecution was unfounded because it was barred by applicable statutes of limitations. Under the standards set forth above, we now consider whether these were, in fact, sufficient grounds for holding appellant in contempt.

### A. The Incriminating Nature of the Desired Testimony and the Possibility of Prosecution

 There is little doubt that the testimony sought from appellant is of an incriminating nature, and the central question, aside from whether appellant is protected by a valid grant of immunity, is whether the possibility of prosecution is "fanciful at most."

The six questions that appellant refused to answer relate to potentially incriminating matter because they concern alleged exchanges by appellant of price information with competitors in the corrugated container industry, and they might reveal his participation from 1968–75, while he worked with Weyerhaeuser and CORCO, in an alleged ongoing price-fixing conspiracy that purportedly continued until 1978. The fact that appellant was given an oral promise of immunity, presumably authorized, and that comparable information from similar witnesses in this litigation was obtained under grants of formal immunity, strongly attests to the injurious nature of appellant's evidence. Indeed, the established policy of federal prosecutors precludes them from offering formal or informal immunity to a witness unless he possesses information which is self-incriminatory.[16] Three of the six questions, repeated from appellant's FBI interview, explicitly asked about exchanges of price information with competitors.[17] Appellant was also asked to identify

---

15. "Tr." refers to pages in the transcript of appellant's April 3, 1981 deposition.

16. *See* "Principles of Federal Prosecution," United States Attorney's Manual, § 9–27.000 at Part F (Provisions governing formal and informal no-prosecution agreements apply only with a person who might otherwise be prosecuted. They are unnecessary if the person is only a potential witness and not a potential defendant).

17. Two of the questions repeated questions verbatim from the interview transcript:

> "Question: Who did you talk to at PCA concerning prices?" [Question on page 67 of interview transcript]

Tr. 123–24.

> "Who did you speak with at Westvaco? What was that gentleman's name again at Westvaco?" [Question on page 90 of interview transcript]

Tr. 124.

the transcript of his FBI interview.[18] This question is potentially incriminating as well because an affirmative answer would constitute an admission under oath that appellant made the prior statements, which could lay the foundation for the introduction of the transcript in a subsequent trial or enable the use of the transcript to impeach appellant. *Cf. United States v. Livingston*, 661 F.2d 239 (D.C. Cir. 1981), at 242–244. Still another question asked appellant to identify who has a copy of the interview transcript.[19] This seemingly innocent question also harbors hidden dangers for the unwary witness. For instance, an answer could reveal the identity of persons with whom appellant has discussed the substance of his interview; this in turn might reveal a waiver of whatever effective immunity from prosecution that he may have received. *See, e. g., United States v. Kuehn*, 562 F.2d 427, 432 (7th Cir. 1977). Further, identification of persons who do *not* have a copy of the interview transcript by not naming them in an answer may lay the groundwork for a subsequent prosecutor to establish that his questions are not derivative of the interview transcript and therefore not covered by a prior grant of immunity. The sixth and final question asks:

> Is your memory today regarding conversations pertaining to exchanges of prices or exchanges of information concerning materials and conditions of sales with competitors, as fresh as it was on October 11, 1977, when you gave the interview to the FBI agent on behalf of the grand jury?

Tr. 127–28. This question has a predicate of incrimination and appellant could not answer it without admitting that he had price exchanges. In addition, the question has a potential for opening a whole new vein of testimony which was not obtained in the prior FBI interview if the respondent should admit new or additional incidents of price-fixing. In sum, it seems plain that answers by appellant to the six questions could well result in injurious disclosures or at least furnish a link in the chain of evidence needed to prosecute. *Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 818–819, 95 L.Ed. 1118 (1951). Thus, the testimony in question is incriminating within the meaning of the fifth amendment.

Since all of the questions are potentially incriminating, we next need to determine whether appellant's fear of prosecution on the basis of admissions as to pre-1975 price communications is realistic or reasonable and not merely fanciful. In this regard we cannot agree with the district judge that the likelihood of prosecution is "fanciful at most," and we must conclude that it was clearly erroneous for him to find that for all practical purposes the statute of limitations had run on possible prosecutions.

■ Appellees downplay the prospect of future criminal prosecution by referring to the obvious fact that the federal criminal trial is finished, and that "there is not the least indication that any prosecutor in any state has any interest in reinvestigating such well-researched territory."[20] But that

A third question asked appellant to affirm an answer in the interview transcript:

> Isn't it the fact that in response to that question which asked of you at the interview conducted on October 11, 1977, you stated as follows: "Okay, talked to two people [naming person], who was sales manager at that time, and big guy, I can't remember the general manager's name. He's moved. He's now a vice president." End of question. *Id.*

**18.** Q Mr. Culy, I'm going to show you again what was previously marked Culy 1, which purports—we represent is a copy of the pretrial interview statement which you have had an opportunity to read, and I will ask you if that is a copy of the—a partial copy of the interview conducted between yourself and the representative of the grand jury, the FBI agent on or about October 11, 1977? Tr. 121.

**19.** "Q . . . Who has a copy, a complete copy of the interview transcript." Tr. 127.

**20.** Appellees' Brief at 13–14. Appellees also argue that the prospect of prosecution is fanciful because all discovery in the Corrugated Container Antitrust Litigation is subject to a protective order. *Id.* This argument is without merit. The district court's protective order is only binding on parties. Further, it states "[n]othing contained in this order shall prevent

does not guarantee, especially in light of the conduct involved in this case, that a criminal action would not be started in some state or federal jurisdiction, if the statute of limitations did not bar it. *See In re Master Key Litigation*, 507 F.2d 292, 293 (9th Cir. 1974). The district judge's rather cursory inquiry during the contempt hearing into this possibility did not illuminate the record before us on this point. *See* Tr. 124–25.[21] It is, therefore, not appropriate to conclude that absent a legal bar to prosecution such as immunity or the statute of limitations, the possibility of prosecution is too remote to allow appellant to invoke the privilege to remain silent. Appellant was a middle level executive in two of the fourteen companies indicted in a federal criminal antitrust case arising from events occurring during his employment with the defendant companies. Appellant's sales positions with these companies put him in the vortex of the price decisions which were the subject matter of the antitrust suit. Twenty-six other individuals were indicted for their involvement in these events. Given these facts we cannot say that appellant's apprehension of prosecution is fanciful.

The Fifth Circuit reached the same conclusion in another part of this same case when it vacated contempt orders against two other non-party witnesses who refused to answer appellees' questions concerning their knowledge of and participation in the alleged nationwide price-fixing conspiracy. *Franey*, 620 F.2d 1086, 1092 (5th Cir. 1980) (noting that a federal grand jury sitting in Ohio had begun its own investigation of the corrugated container industry).

Thus, appellant's fifth amendment privilege in this case should not be overridden on statute of limitations grounds unless it is clear that none apply. The district judge's written order stated:

> Counsel for [appellant] did not present proof that any applicable statute of limitations had not run. The federal statute of limitations is four years which indicates that [appellant] would not be subject to prosecution for the period before December 31, 1975.

J.A. 2.[22] We do not believe this to be a sufficient basis for the order for several reasons. First, during the telephone con-

---

the use of documents or information designated as confidential at trial or at depositions." Pre-trial Order No. 47, at 22, *In re Corrugated Container Antitrust Litigation, M. D. L. 310* (S.D.Tex., April 8, 1980), J.A. 140. More important, it is not possible to construe the protective order as forestalling criminal prosecution because this would amount to an unauthorized judicial grant of immunity by the court. *See Franey*, 620 F.2d at 1094; *United States v. Davis*, 623 F.2d 188 (1st Cir. 1980); *United States v. Lenz*, 616 F.2d 960 (6th Cir. 1980); *United States v. Housand*, 550 F.2d 818 (2d Cir. 1977); *United States v. Garcia*, 544 F.2d 681 (3rd Cir. 1976).

We also reject appellees' implication that in order to establish a substantial likelihood of prosecution it is necessary to show that an investigation or prosecution is actually in progress in some jurisdiction.

21. The district judge might possibly have been apprised of facts relevant to the possibility of prosecution as presiding judge over the grand jury investigation in 1978, the plea arrangements of some defendants, the criminal trial, the class action trial and now discovery in the opt-out cases; if so his judgment in evaluating appellant's claim of privilege would warrant considerable deference. *See United States v. Van Deveer*, 577 F.2d 1016, 1017 (5th Cir.

1978); *Ryan v. Comm'r of IRS*, 568 F.2d 531, 539 (7th Cir. 1977). However, the district judge's terse statement of the reasons for his contempt order does not suggest that he relied on any facts developed outside the contempt hearing as to the likelihood of future prosecution. During the hearing the district judge referred to "Mr. Favaretto's letter regarding no prosecution." Tr. 122. This letter, dated June 18, 1980, was sent from the Justice Department to another witness' counsel. The letter concerns the Department's intention not to prosecute this other individual. We do not believe the general statements in this letter regarding the Department's intention not to prosecute other individuals is a sufficient guarantee against all future prosecutions to support the contempt order in this case.

22. The Fifth Circuit apparently places the burden of proving the running of statutes of limitations on the moving party, and not, as the district judge did here, on the witness. *See Franey*, 620 F.2d at 1092. (The witnesses' answers to the deposition questions may well reveal that they have violated federal and state criminal antitrust laws, in part because "[t]here has been no suggestion that the applicable statutes of limitations have run . . . .")

ference call appellant's counsel requested but was denied an opportunity to brief the statute of limitations issue. The district court ruled without the benefit of a written submission on the issue. Second, it is readily apparent now that relevant statutes of limitations have not yet run out. The alleged criminal conspiracy which spawned this litigation involved the period between 1960 and 1978. The statute of limitations begins to run for an individual defendant involved in a continuing conspiracy from the conclusion of the conspiracy unless an individual can show that he withdrew from the conspiracy by an affirmative act designed to defeat the purpose of the conspiracy. *E. g., United States v. James,* 609 F.2d 36 (2d Cir.), *cert. denied,* 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1979); *United States v. Fitzgerald,* 579 F.2d 1014 (7th Cir.), *cert. denied,* 439 U.S. 1002, 99 S.Ct. 611, 58 L.Ed.2d 677 (1978); *Thomas v. Petro-Wash, Inc.,* 429 F.Supp. 808, 812–13 (M.D.N.C.1977). *See also In re Multidistrict Vehicle Air Pollution,* 591 F.2d 68, 70–71 (9th Cir. 1979); *Fontana Aviation, Inc. v. Baldinelli,* 418 F.Supp. 464, 469–70 (W.D. Mich.1976). Before the statute runs out the individual remains liable for his own criminal acts, and also for the acts of his co-conspirators, including those acts occurring after the individual's own last overt act in furtherance of the conspiracy. *Id.* If appellant's answers to questions about his pre-1975 action linked him to a conspiracy ending in 1978, it must be presumed that the statute began to run in 1978 since there is no basis that we are aware of for concluding that appellant withdrew from the alleged conspiracy. The federal statute of limitations referred to by the district judge is four years and would not run out until 1982. 15 U.S.C. § 15b. More significantly, however, in view of the federal promise of immunity, discussed below, no relevant state statute of limitations would apparently run out before 1983.[23] In sum, in 1981 appellant did have reasonable cause to fear prosecution for his answers.

### B. The Lack of Formal Statutory Immunity

It thus becomes critical to determine whether appellant's answers to the six questions would be protected under the terms of the immunity granted him earlier in his 1977 interview with the FBI. Unless the answers are validly immunized, an order requiring him to answer would violate appellant's privilege against self-incrimination.

The district court as well as both parties on this appeal appear to have assumed that appellant received the equivalent of statutory immunity for his FBI interview and have consequently focused on the issue of whether use immunity under 18 U.S.C. § 6002 covers answers to questions in civil depositions where the questions themselves are derived from the transcript of the immunized testimony. There is indeed a split of authority on this issue.[24] However, an even more basic problem presents itself in our reading of the transcript of the proceedings below. Every one of the other cases which have addressed the issue of the applicability of use immunity granted in the course of a criminal proceeding to com-

23. In Indiana where appellant worked for Weyerhaeuser and CORCO the statute of limitations is five years. Ind. Code §§ 24–1–1–3, 35–41–4–2. Appellant was transacting business during 1968–1975 with plants in Michigan and Ohio among other places. The statute of limitations in Michigan is six years, Mich.Stat.Ann. § 28.964 [M.C.L.A. § 767.24], and in Ohio there is no limitation period for antitrust actions, Ohio Revised Code § 1331.12. In Ohio where criminal prosecution of appellant would never be time-barred by statute there was at least recently a federal grand jury investigating antitrust violations in the corrugated container industry. *See Franey,* 620 F.2d at 1092.

24. *Compare Franey,* 620 F.2d at 1092–95; *Conboy,* slip op. at 11–37 (Sprecher, J., dissenting) (deposition answers *not* protected by prior statutory immunity grant and contempt order should be vacated *with Fleischacker,* 644 F.2d at 75–80; *Franey,* 620 F.2d at 1095–96 (Johnson, J., dissenting); *Conboy,* slip op. at 1–11; *Appeal of Starkey,* 600 F.2d 1043 (8th Cir. 1979) (deposition answers are protected by prior statutory immunity grant and contempt order should be upheld).

pelled testimony in a subsequent civil case involved a deponent who was initially compelled to testify only after the issuance of a judicial order conferring statutory use immunity.[25] Appellant's FBI interview was not compelled by any order formally granting him full statutory use immunity, but came about only as a result of an oral promise by the FBI agent, the precise nature of which we cannot discern from the record on this appeal. Without formal statutory immunity we do not believe it is reasonable to assume that whatever protection appellant may have received against future federal prosecution is sufficient to protect him against any future use, direct or indirect, by federal or state prosecutors. Thus to require appellant to offer incriminating testimony at his civil deposition would be to do so at his peril.

Federal statutes prescribe a specific and exclusive procedure whereby a district judge, upon motion by a United States Attorney approved by high-ranking Justice Department officials, may order a witness to testify or provide other information before, or ancillary to, a federal court or grand jury,. notwithstanding the witness' fifth amendment privilege. 18 U.S.C. §§ 6002, 6003.[26] The witness is not thereby immunized from prosecution. The only benefit as far as the witness is concerned is that no testimony or other information compelled under the order, or any information directly or indirectly derived from such testimony may be used against him in a subsequent criminal prosecution. *Id.* This limited use immunity is available only if the immunity is granted in compliance with the clear requirements of the statute.[27]

**25.** Although one of the deposition witnesses in *Franey* received an informal no-prosecution letter for his FBI interview, he later testified at trial and then received a formal grant of immunity. For that reason, the Fifth Circuit specifically declined to rule on the validity of the informal immunity grant or its scope. 620 F.2d at 1092 n.4.

**26.** 18 U.S.C. § 6002. Immunity generally

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—
(1) a court or grand jury of the United States,
(2) an agency of the United States, or
(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,
and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.
18 U.S.C. § 6003. Court and grand jury proceedings

(a) In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this part.

(b) A United States attorney may, with the approval of the Attorney General, the Deputy Attorney General, or any designated Assistant Attorney General, request an order under subsection (a) of this section when in his judgment—
(1) the testimony or other information from such individual may be necessary to the public interest; and
(2) such individual has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

**27.** *Fleischacker*, 644 F.2d at 78 n.13 *citing United States v. Bryan*, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1950); *In re Daley*, 549 F.2d 469, 479 (7th Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977). *See generally* "Immunity-Compelled Testimony," United States Attorney Manual, §§ 1–11.000 *et seq.* (1977).

While a witness may not have the benefit of statutory use immunity, he may nevertheless have some protection from prosecution either because the prosecutor is estopped from reneging on his agreement not to prosecute, *e. g., Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 347, 83 S.Ct. 448, 453, 9 L.Ed.2d 357

888

This appellant did not receive anything remotely resembling statutory use immunity.[28] The parties agree that he was given only an oral promise that he would not be prosecuted by the federal authorities by reason of any of his interview statements. We cannot even be sure of the precise scope of this promised immunity because the discussion containing the details of the purported agreement between appellant and the FBI agent is not part of the record.[29] At a minimum there is (1) a substantial question on this record as to the extent of the protection promised appellant by the verbal promise made to him during his 1977 interview and (2) no authority for ruling that oral promises of immunity by an investigator, not in accord with statutory requirements, bind all federal and nonfederal prosecutors. In the face of such uncertainties he is entitled to rely on his fifth amendment rights as to potentially incriminating questions when prosecutions are neither fanciful nor barred by the applicable statute of limitations.[30]

Given all this, we hold that appellant could not be compelled to answer the six questions he refused to respond to, and the

district court's order of civil contempt is hereby

*Vacated.*

---

(1963); *Mobley v. Meek*, 531 F.2d 924, 926 (8th Cir. 1976); *United States v. Carter*, 454 F.2d 426 (4th Cir. 1972); *United States v. Pellon*, 475 F.Supp. 467, 479 (S.D.N.Y.), *aff'd* 620 F.2d 286 (2d Cir. 1979), or by *de facto* immunity when the district court errs in compelling the witness over his objection to answer questions. *Adams v. Maryland*, 347 U.S. 179, 181, 74 S.Ct. 442, 444, 98 L.Ed. 608 (1954). This latter *de facto* immunity must, however, be distinguished from statutory immunity because it is essentially an after-the-fact exclusionary rule which "is solely remedial and cannot be used as a rationale to support a judicial decision" to compel testimony or hold a witness in contempt. *Fleischacker*, 644 F.2d at 78 n.13, quoting *In re Folding Carton Antitrust Litigation*, 609 F.2d 867, 872 n.11 (7th Cir. 1979).

28. In contrast to the requirements of 28 U.S.C. §§ 6002, 6003, *see* note 26 *supra*, appellant voluntarily agreed to submit to the interview. Nothing on the record indicates that he did or would have otherwise refused to testify. In addition, we have no knowledge, that the FBI agent received approval from his superiors for the no-prosecution agreement, appellant was not placed under oath during the interview, Tr. 100, and there was no court order compelling

his interview testimony. These facts may be contrasted to the procedures for obtaining formal statutory immunity, United States Attorney Manual, §§ 1–11.000 *et seq.* (1977), and informal no-prosecution agreements, United States Attorney Manual, §§ 9–27.000 *et seq.*, Part F.

29. Nine pages of appellant's interview transcript that was submitted to the grand jury were released to the parties. This portion of the transcript does not contain any information about a no-prosecution agreement. We have not been able to obtain the rest of the transcript because it is not part of the record in the pending civil suits. We also have been unable to discover any other record of the nature of the prosecutorial promises made to appellant. *See* note 21 *supra* regarding the Justice Department's intention not to prosecute one other individual.

30. The district court was not itself empowered to immunize appellant for civil deposition testimony and thereby prevent him from legitimately invoking his privilege to remain silent.